973 So.2d 301 (2008)
Cherri S. CASE, Appellant
v.
PUBLIC EMPLOYEES' RETIREMENT SYSTEM, Appellee.
No. 2006-SA-01704-COA.
Court of Appeals of Mississippi.
January 22, 2008.
*304 George S. Luter, attorney for appellant.
Mary Margaret Bowers, attorney for appellee.
Before MYERS, P.J., BARNES and ROBERTS, JJ.
BARNES, J., for the Court.
¶ 1. Cherri Case appeals the decision of the Hinds County Circuit Court, First Judicial District, which affirmed the ruling of the Public Employees' Retirement System (PERS) Board of Trustees denying her non-work related retirement disability benefits. Case applied for disability retirement benefits based on numerous health problems, including hypertension, heart problems, fibromyalgia, and depression and anxiety. The circuit court found the decision by the PERS Board of Trustees (Trustees) was supported by substantial evidence. On appeal, Case argues that PERS's decision to deny her disability benefits is not supported by substantial evidence. While we find that PERS's decision regarding Case's physical condition is supported by substantial evidence, we cannot do the same with regard to her mental condition. Therefore, we reverse and remand for an award of disability benefits as allowed under applicable law.

STATEMENT OF FACTS AND PROCEDURAL HISTORY
¶ 2. Case was employed by the Brookhaven school district as a secretary. She began working for the school district in 1971 but quit work for a time in 1982 and withdrew her retirement contributions. At the time of her application for PERS disability benefits, she had ten-and-three-quarters years of state service. Case's physical activities at work consisted primarily of clerical duties as a secretary, bookkeeper, and file clerk, which required her to operate office equipment such as computers, telephones, adding machines, copiers, and typewriters.
¶ 3. Over the span of 1995 to 2002, Case was treated by numerous physicians for a variety of medical problems. Her primary physician, Dr. Braxter P. Irby, Jr., treated Case for supraventricular tachycardia, *305 atrial fibrillation with rapid response, hypertension, osteoarthritis, fibromyalgia, hiatal hernia, and morbid obesity. Two cardiologists, Dr. Harper Stone and Dr. David Mulholland, also treated Case for hypertension and atrial fibrillation. Dr. Ken Hensarling and Dr. Linda Rockhold, both rheumatologists, treated Case for fibromyalgia and arthritis. Finally, Dr. Winston Capel treated Case for neck and arm pain associated with radiculopathy. A detailed review of Case's treatment by these physicians is presented below.
¶ 4. Both Dr. Irby and Dr. Mulholland opined that Case is permanently disabled as result of hypertension and heart problems. However, throughout Dr. Mulholland's records, he notes numerous times that Case's atrial fibrillation is under good control with medication. Dr. Irby also opined that Case is disabled due to fibromyalgia and depression while Dr. Rockhold stated that Case has no fibromyalgiarelated impairments. Neither Dr. Hensarling nor Drs. Stone or Capel submitted an opinion as to whether Case is disabled. Dr. Jo Lynn Polk, the physiatrist[1] who performed an independent medical evaluation of Case at the behest of PERS, found Case not to be disabled. The PERS Disability Appeals Committee (Committee) agreed. The Committee found that, notwithstanding the opinions of Drs. Irby and Mulholland, Case's medical records reveal that her blood pressure readings were normal on most visits to her physicians and that her heart problems were controlled by medication. The Committee further found that Case's fibromyalgia and arthritis were not disabling and that, because. Case had not been treated by a specialist for her depression, an award of disability benefits was not justified.
A. Dr. Braxter P. Irby, Jr.
¶ 5. Case's medical problems pertaining to this action began in 1995. At that time she sought treatment from Dr. Irby, a nephrologist, for what he diagnosed as supraventricular tachycardia, atrial fibrillation with rapid response, hypertension, osteoarthritis, fibromyalgia, hiatal hernia, and morbid obesity. Over the next six years, Dr. Irby saw Case on numerous occasions for symptoms associated with these diagnoses. On March 3, 1995, Case visited the emergency room at King Daughter's Hospital in Brookhaven, Mississippi, complaining of heart palpitations and weakness. It was determined that Case had supraventricular tachycardia which later slowed to atrial fibrillation with a rapid ventricular response. Case was discharged on March 7, 1995, after she converted to a normal sinus rhythm with nonspecific ST-abnormalities. Her discharge, documentation lists hypertensive cardiovascular disease, supraventricular tachycardia characterized by atrial tachycardia and atrial fibrillation with a rapid ventricular response, osteoarthritis, exogenous obesity, and a history of hiatal hernia with gastroesophageal reflux disease (GERD). Later that month, after Case visited him complaining of heart palpitations,[2] Dr. Irby conducted a Holter monitor test on Case. According to Dr. Irby, the test showed an infrequent sinus tachycardia but overall showed a fairly normal heart rate and rhythm. Dr. Irby noted at this time that he saw no reason to change *306 Case's medications. In April 1995, Dr. Irby again saw Case and noted that she had experienced an elevated blood pressure and that he did not feel that, any progress was being made from a cardiovascular standpoint. Being unable to explain why Case continued to have sinus tachycardia, he decided to send Case to a cardiologist at the Jackson Heart Clinic. He also increased her Calan SR 240 dosage at this time. In May 1995, Dr. Irby stated that he would refer Case to Dr. Ken Hensarling, a rheumatologist, in order to address Case's musculoskeletal symptoms. Case next saw Dr. Irby on May 24, 1995, at which time he noted that if her blood pressure stayed above 90 diastolic, he would alter her medical regimen.
¶ 6. On August 17, 1995, Dr. Irby noted that Case had recently experienced an episode of supraventricular tachycardia that required a visit to the emergency room; an EKG showed atrial fibrillation with a rapid ventricular response which subsequently converted back to normal sinus rhythm. Dr. Irby noted that, on that day, Case's heart had a regular rate and rhythm, and he increased her Calan SR 240 dosage in order to treat her atrial fibrillation. He also stated that he would consult with Dr. Harper Stone, a cardiologist, in order to decide how to prevent a recurrence of Case's intermittent atrial fibrillation. Dr. Irby later noted that Dr. Stone suggested that Case simply continue with the increased Calan dosage.[3]
¶ 7. Case visited Dr. Irby again on November 11, 1995, complaining of heart palpitations. Dr. Irby noted a rapid heart rate with an irregular rhythm and an EKG showing atrial fibrillation with rapid ventricular response. On May 15, 1996, Dr. Irby noted that Case had experienced no significant recent palpitations and that symptomatically she was doing as well as he had seen her in quite a while. Case was again admitted to King's Daughters Hospital in May 1997 for heart palpitations and significant cardiovascular problems. Dr. Irby transferred Case to St. Dominic's Hospital in Jackson so that she could be evaluated by Dr. Harper Stone because Dr. Irby was unable to convert Case back to a sinus rhythm. In January 1998, Dr. Irby noted that Case experienced an episode of atrial fibrillation three or four days previously but that she converted back to a normal heart rhythm simultaneously. He noted that her EKG showed a slight tachycardia but only minimal nonspecific STT abnormalities and that there was no evidence of arrhythmia at that time. Dr. Irby then conducted another Holter monitor test on Case, which revealed a normal sinus rhythm with frequent unequivocal PVCs and no couplets, triplets, or sustained ventricular arrhythmia at all. The test also revealed no significant supraventricular arrhythmia other than a sinus tachycardia and no significant conduction or STT abnormalities.
¶ 8. Case visited Dr. Irby again on September 26, 2000, complaining of hypertension; however, Dr. Irby noted that Case's blood pressure was normal so he did not adjust her medication. In October of 2000, Dr. Irby increased the dosage of the blood pressure medicine Case was taking and added a new blood pressure medicine to Case's medical regimen. In November 2000, he noted that Case's blood pressure seemed to be under control. After noting that she was deteriorating from a symptomatic standpoint,[4] Dr. Irby ordered another *307 Holter monitor test in December 2000, which revealed a normal sinus rhythm with one run of what appeared to be atrial fibrillation.[5] Following the Holter monitor test, Dr. Irby spoke with Dr. Mulholland who reviewed the monitor. Dr. Mulholland advised that Case was "simply having PVCs occasionally" and should continue her current medical regime. While Dr. Mulholland did not feel Case would get any better symptomatically, he did not think that any further therapeutic adjustments were necessary.
¶ 9. In relation to Case's application for permanent disability benefits, Dr. Irby submitted a "Form 7 Statement of Examining Physician," in which he stated that Case suffers from intermittent atrial fibrillation, osteoarthritis, hypertension and hypertensive cardiovascular disease, anxiety and depressive neurosis, and fibromyalgia. "He stated that Case is "totally incapable of maintaining any type of employment due to constant symptoms from [the] above [conditions]." On May 1, 2002, Dr. Irby wrote a letter stating that Case was taking Effexor for stress reaction with anxiety and depressive neurosis. While Dr. Irby had recommended that Case see a psychiatrist or a clinical psychologist for her depression, she had been unable to do so for financial reasons. Dr. Irby concluded:
This lady is both physically and mentally unable to perform her duties as a secretary due to the depressive neurosis, stress reaction, the fibromyalgia syndrome with joint pain. The stress of her work aggravates her atrial fibrillation and her depression. I feel strongly that she is disabled and would hope that you would reconsider her situations before denying her disability.
B. Dr. Harper Stone and Dr. David Mulholland
¶ 10. Dr. Irby referred Case to Dr. Stone and Dr. Mulholland, both cardiologists, because of her heart-related problems. Case saw Dr. Stone in early 1995 and underwent an extensive cardiac evaluation, which was normal aside from a finding of proximal atrial fibrillation. Case had a Cardiolite scan, EKG, and echocardiogram, all of which were normal. As a result, Dr. Stone advised Case to take an aspirin per day and, in a letter to Dr. Irby, stated that Case's chest pain was unlikely to be cardiac in origin. After Case experienced another episode of intermittent atrial fibrillation in November 1995, Dr. Stone advised Dr. Irby of the option of starting Case on a new medication to control her heart rate.
¶ 11. As was discussed previously, in May 1997, Case experienced an episode of atrial fibrillation, and was transferred by Dr. Irby to Dr. Stone at St. Dominic's. Dr. Stone admitted Case to the hospital and changed her medication. Another echocardiogram was performed and was normal in most respects. Dr. Mulholland then assumed Case's care and discharged her after prescribing Tambocor, which he stated converted her to a sinus rhythm. In June 1997, Dr. Mulholland saw Case for a follow-up of her atrial fibrillation. At that time, he noted that Case had hypertension with diastolic dysfunction by echo as the probable antecedent cause of her atrial fibrillation. Dr. Mulholland stated that Case had been doing well on the Tambocor, and her electrocardiogram showed a sinus rhythm and probable LVH as well as nonspecific ST-T changes.[6] Dr. *308 Mulholland next saw Case on August 21, 1997, for a follow-up evaluation. He noted that Case's atrial fibrillation was under good control with the Tambocor and that she had not experienced a recurrence of her atrial fibrillation.
¶ 12. Case visited Dr. Mulholland again in March 1999, apparently at the request of Dr. Capel, who was evaluating Case for potential back surgery and needed medical clearance to perform the operation. At the time of the visit, Case's blood pressure was 148/98 and her pulse was 86. Her electrocardiogram showed a normal sinus rhythm with nonspecific ST-T abnormalities, which the Appeals Committee determined to be normal. Dr. Mulholland noted that Case's atrial fibrillation was controlled with Tambocor. He made no changes to Case's medical regime and advised her to return in six months. Dr. Mulholland also informed Dr. Capel that Case should take her antiarrhythmic and antihypertensive drugs early on the morning of the surgery, but he saw no reason why she could not withstand general anesthesia. Dr. Mulholland next saw Case in August 1999, and noted that Case had recalled three atrial fibrillation spells in the last year that lasted approximately twelve hours each. He then stated that she was doing well and, in a letter to Dr. Irby, stated that Case was still taking the Tambocor "to good effect." He advised Case to return in one year. In September 2000, Dr. Mulholland saw Case for a follow-up visit and found that her atrial flutter[7] was under good control with the Tambocor, but she remained moderately hypotensive. Dr. Mulholland prescribed a new blood pressure medicine but made no other recommendations.[8] He advised Case to return in one year. In September 2001, Case again saw Dr. Mulholland for a follow-up visit. Dr. Mulholland stated that Case's atrial flutter was under good control with the Tambocor, but she suffered from severe hypertension. He made no changes to her medical regimen.[9] Later that month, Dr. Mulholland wrote a letter to PERS stating that Case was "disabled to work on the basis of severe nearly uncontrollable hypertension associated with an atrial arrhythmia, atrial flutter."
C. Dr. Ken Hensarling
¶ 13. From 1994 to 1995, Case was treated by Dr. Hensarling, a rheumatologist in Jackson, Mississippi. He diagnosed Case with fibromyalgia and prescribed non-narcotic pain relievers. However, Dr. Hensarling did not submit a "Form 7 Statement of Examining Physician" indicating any impairment, limitation, or disability on behalf of Case. The Committee found that all of Case's lab studies from Dr. Hensarling[10] were normal or within acceptable limits. Further, the Committee found that Dr. Hensarling had not made any mention in any of his medical records that would suggest Case was disabled or *309 had restrictions, limitations, or impairments.
D. Dr. Linda Rockhold
¶ 14. Case began seeing Dr. Rockhold, also a rheumatologist, in 1995. Dr. Rockhold treated Case for fibromyalgia and osteoarthritis. On the "Form 7 Statement of Examining Physician" that Dr. Rockhold submitted on behalf of Case, she stated that Case has "no fibromyalgia related impairments."
E. Dr. Winston Capel
¶ 15. Dr. Capel, a neurosurgeon, treated Case for right upper extremity, pain caused by C7 radiculopathy. He performed a cervical fusion operation in March 1999. In June 1999, Dr. Capel noted that, at three months post-operation, Case reported no significant right arm pain, but she did have some neck pain that she was unable to distinguish from her usual fibromyalgia pain. Dr. Capel cleared Case to return to work.
¶ 16. On a form entitled "Employer's Certification of Job Requirements," Case's employer stated that Case is unable to perform the duties of her job on account of medical diagnoses, including muscle and joint pain; severe headaches; heart irregularities; and high blood pressure. In addition, the principal of Brookhaven High School, where Case was employed, submitted a letter stating that Case's multiple health problems had resulted in excessive absenteeism. In the principle's opinion, she was not able to maintain the consistent, reliable schedule required for holding a job in any occupation due to the frequency of her absences, which were caused by her medical condition.
¶ 17. In February 2002, Dr. Polk, a physiatrist, conducted an independent medical examination of Case at the request of PERS. On physical examination, Dr. Polk measured Case's blood pressure at 180/104, but noted that the cuff size was inadequate for Case's large arms. She further noted that Case's heart had a regular rhythm and that her mental affect was flat. Dr. Polk listed her impressions as: (1) chronic diffuse pain with deconditioning consistent with fibromyalgia, (2) depression with anxiety, (3) hypertensionstage 2, (4) intermittent atrial fibrillation, by historycontrolled with current medications, (4) intermittent hand tremorsobserved on physical examination with no functional impairment, (5) decreased active bilateral shoulder abduction and flexionunclear etiology, probably secondary to impression (1) above. Dr. Polk then stated the following:
In my opinion, Ms. Case is physically capable of performing the job of secretary. She cannot perform work activities overhead due to restrictions in active shoulder, abduction and flexion. There is no objective medical evidence that Ms. Case is unable to work as a secretary because of her hypertension associated with an atrial arrhythmia. She has not had formal psychotherapy to address her depression and anxiety. Therefore, there is not enough medical evidence to support a disability based on her mental condition.
Ms. Case is currently able to work part time. Physical therapy, especially aquatic therapy, would increase her endurance to allow her to work full time.
¶ 18. On April 10, 2002, PERS's Executive Director, Frank Ready, wrote Case a letter stating that there was insufficient objective evidence to support the claim that Case's medical condition prevented her from performing her duties as a secretary. Case appealed to the PERS Disability Appeals Committee, which held a hearing on July 29, 2002. Appearing at the hearing were Presiding Hearing Officer, *310 Dr. Joseph Blackston, and Drs. David Duddleston and William Nicholas. Represented by counsel at the hearing, Case testified to her numerous health problems, including her blood pressure, atrial fibrillation, fibromyalgia, and arthritis. Case testified that she had not worked since January 18, 2002. She stated that she had tried to work, but that her poor health has caused her to miss work frequently. Case further testified that the main reason she could not work was her "nearly uncontrollable high blood pressure." Later, she stated that her main impairment was her heart condition and her blood pressure. She stated that she had pain in her knees, neck, shoulders, and arms but could control the pain. Case testified that the Social Security Administration had sent her for a psychological evaluation the week prior to the hearing; however, the results were not available at that time. She also testified that her anxiety, and depression seemed to have gotten worse and she stayed depressed most of the time. Case's husband testified that his wife was in constant pain and that, with regard to her blood pressure problems, "it's either quit work or die."[11]
¶ 19. The Committee, however, denied disability benefits. On April 22, 2002, the Trustees adopted the Committee's recommendation. Case appealed to the Hinds County Circuit Court, and on August 28, 2006, that court affirmed the order of the Trustees, thereby denying Case disability benefits. Case then perfected her appeal, which was assigned to this Court.

STANDARD OF REVIEW
¶ 20. Review of administrative agency decisions by this Court is limited. See URCCC 5.03. Rule 5.03 of the Uniform Rules of Circuit and County Court Practice provides that an agency's decision will not be disturbed on appeal unless the judgment was: (1) unsupported by substantial evidence, (2) arbitrary and capricious, (3) beyond the power of the agency, or (4) violates the complainant's statutory or constitutional rights. See Pub. Employees' Ret. Sys. v. Smith, 880 So.2d 348, 350-51(¶ 12) (Miss.Ct.App.2004) (citing Pub. Employees' Ret. Sys. v. Dearman, 846 So.2d 1014, 1018(¶ 13) (Miss.2003)). This Court may not substitute its judgment for that of the administrative agency, nor may it reweigh the evidence. Pub. Employees' Ret. Sys. v. Howard, 905 So.2d 1279, 1284(¶ 15) (Miss.2005). If an agency's decision is not based on substantial evidence, it will be deemed arbitrary and capricious. Pub. Employees' Ret. Sys. v. Allen, 834 So.2d 50, 53(¶ 10) (Miss.Ct.App. 2002) "Substantial evidence" has been defined as "such relevant evidence as reasonable minds might accept as adequate to support a conclusion." Pub. Employees' Ret. Sys. v. Marquez, 774 So.2d 421, 425(¶ 13) (Miss.2000). It is "more than a `mere scintilla' or suspicion." Id.

ANALYSIS
¶ 21. Case alleges two points of error. First, Case contends that PERS's decision denying her application for disability benefits is not supported by substantial evidence because her medical disability was supported by the reports of her treating internist, cardiologist, and her principal; while the Committee erroneously relied on the report of Dr. Polk, who stated Case could only work part-time. Second, Case asserts that PERS's decision should be reversed and remanded for PERS: (1) to obtain a psychiatric report since PERS *311 failed to order a psychiatric evaluation; (2) to obtain the records regarding Case's cervical fusion; and (3) to obtain Case's Social. Security disability decision and review the psychological report obtained in that case.
¶ 22. As PERS notes in its brief, the primary issue before this Court is not whether there is evidence to support Case's disability, but whether there is substantial evidence to support PERS's finding that she was not disabled. See Doyle v. Pub. Employees' Ret. Sys., 808 So.2d 902, 905(¶ 8) (Miss.2002) (citing Pub. Employees' Ret. Sys. v. Dishmon, 797 So.2d 888, 891(¶ 9) (Miss.2001)). The PERS Medical Board, Disability Appeals Committee, and Board of Trustees had to determine whether Case qualified for nonwork related disability retirement. For disability retirement determination under Mississippi Code Annotated section 25-11-113(1)(a) (Rev.2006), there are two requirements. First, the medical board, after an evaluation of medical evidence, must certify that "the member is mentally or physically incapacitated for the further performance of duty, that the incapacity is likely to be permanent, and that the member should be retired." Miss.Code Ann. § 25-11-113(1)(a). Then, the medical board shall apply the statutory definition of "disability" which is "[t]he inability to perform the usual duties of employment or the incapacity to perform such lesser duties, if any, as the employer, in its discretion, may assign without material reduction in compensation." Id.
¶ 23. An employee must prove non-work related permanent retirement disability to the PERS Medical Board according to the legal requirements of Mississippi Code Annotated section 25-11-113(1)(a). The agency, not the reviewing court, acts as the finder of fact. Pub, Employees' Ret. Sys. v. Cobb, 839 So.2d 605, 609(¶ 12) (Miss.Ct.App.2003) (citing Metal Trims Indus., Inc. v. Stovall, 562 So.2d 1293, 1296 (Miss.1990)). Fact-finding includes evaluating the testimony of witnesses for credibility. Cobb, 839 So.2d at 609(¶ 12). PERS has the sole responsibility of assessing the evaluations by medical personnel and determining which evaluations to rely upon. Johnston v. Pub. Employees' Ret. Sys., 827 So.2d 1, 3(¶ 7) (Miss.Ct.App.2002) (citing Byrd v. Pub. Employees' Ret. Sys., 774 So.2d 434, 438(¶ 15) (Miss.2000)).
¶ 24. "Sorting through voluminous and contradictory medical records, then determin[ing] whether an individual is permanently disabled is better left to physicians, not judges." Howard, 905 So.2d at 1287(¶ 23). Moreover, it is long established that the Mississippi Constitution does not allow the judiciary to retry matters appealed from agencies de novo. Miss. State Tax Comm'n v. Mississippi-Alabama State Fair, 222 So.2d 664, 665 (Miss.1969). The reviewing court must affirm the agency's decision if there is "substantial evidence" and the decision is neither "arbitrary nor capricious." URCCC Rule 5.03. "Substantial evidence" is defined as "that which provides an adequate basis of fact from which the fact in issue can be reasonably inferred." Dishmon, 797 So.2d at 892(¶ 13). An agency decision is "arbitrary" if "it is not done according to reason and judgment, but depending on the will alone." Miss. State Dep't of Health v. Natchez Cmty. Hosp., 743 So.2d 973, 977(¶ 13) (Miss.1999). A "capricious" decision is "done without reason, in a whimsical manner, implying either a lack of understanding of or disregard for the surrounding facts and settled controlling principles." Id. If there is substantial evidence supporting the agency's decision, the reviewing court must give this decision substantial deference. Cobb, 839 So.2d at 609(¶ 12).
*312 I. Was PERS's decision denying Case's application for disability benefits supported by substantial evidence?
A. Hypertension
¶ 25. As the Appeals Committee found, Case "attributes a substantial number of work days and work time lost as a result of a her `uncontrollable hypertension,' and in her direct testimony to the PERS Disability Appeals Committee stated her `main problem' was her blood pressure and heart problems." At the hearing in this matter, Case testified that she often was unable to work due to her chest pain and weakness, which she attributed to high blood pressure. Case's primary physician, Dr. Irby, opined that Case suffered from hypertension and hypertensive cardiovascular disease and that this medical problem, among others, rendered her unable to perform her job on a full- or part-time basis. Case's cardiologist, Dr. Mulholland, stated the following regarding Case's hypertension:
[H]er hypertension is in poor control on Vasotec, Norvasc, Diovan, and Maxzide. I believe that Cherri's work activities probably contribute materially to the difficulty of controlling her hypertension. Severe hypertension of this magnitude is almost certain to lead to further medical problems such as congestive heart failure. I think that Cherri is disabled to work on the basis of severe nearly uncontrollable hypertension associated with an atrial arrhythmia, atrial flutter.
The Appeals Committee, however, found as follows:
On repeated visits to her primary physician, and on visits to cardiology specialists, Ms. Case's blood pressure is clearly documented as within acceptable levels. In fact, a detailed review of the sixty-five pages of medical records supplied by Dr. Irby reveals only a few instances where Ms. Case experienced abnormal blood pressure readings. . . . Ms. Case does in fact take several medications for hypertension, but there is little evidence in the record to indicate that her blood pressure is "uncontrolled" or that a requirement of numerous medications necessarily suggests disability, impairment, or restrictions. Ms. Case indicated in her testimony to the Appeals Board that she would experience high blood pressure at work, ostensibly because of stressful working conditions, but there is no documentation in the records reviewed by PERS of elevated blood pressures in the work place, or that Ms. Case sought treatment by the school nurse, etc. (other than to rest) during these episodes where she could not attend to her job duties.
The Committee also found it noteworthy that, when Case visited King's Daughter's Hospital on August 29, 2001, her blood pressure was "close to normal at 152/92," and when Case was seen by Dr. Irby the following day, her blood pressure was "normal at 140/94."
¶ 26. We find that PERS's decision regarding Case's hypertension is supported by substantial evidence. Although Case's blood pressure readings might appear elevated to us, we are neither qualified nor permitted to make such a determination, as it is well settled that "[t]he reviewing court may not substitute its judgment for that of the administrative agency, nor may it reweigh the evidence presented." Pub. Employees' Ret. Sys. v. Lewis, 954 So.2d 440, 445(¶ 12) (Miss.Ct.App.2006) (citing Howard, 905 So.2d at 1285(¶ 15)). As this Court stated in Flowers v. Pub. Employees' Ret. Sys., 952 So.2d 972, 980(¶ 26) (Miss.Ct.App.2006), "[p]art of the benefit of having physicians on the Disability Appeals Committee is so that they *313 can analyze the medical claims." "When a thorough set of findings and conclusions explain the expertise that those physicians applied, we find no fault in relying on such expertise." Id. We also recognized that "[w]hat is required [of the Committee] is an explanation that goes beyond mere conclusions." Id. at 981(¶ 28). The Committee, utilizing their medical expertise, reviewed Case's medical records. Notwithstanding Dr. Irby's and Dr. Mulholland's opinions, the Committee found that Case's medical records showed that her blood pressure readings were within acceptable limits on most visits to Dr. Irby. Her cardiology specialists' and Dr. Irby's medical records showed only a few instances where Case's blood pressure was abnormal. Thus, the Committee sufficiently explained its conclusion that Case's hypertension was not disabling; therefore, we find the Committee's conclusion in this regard to be supported by substantial evidence.
B. Arrhythmia
¶ 27. Case has a condition known as atrial fibrillation, also referred to in the record at times as atrial arrhythmia or atrial flutter. In a letter to PERS, Case's cardiologist, Dr. Mulholland, stated that Case's arrhythmia/atrial flutter had been reasonably controlled on a medication known as Tambocor. He also stated his belief that Case is unable to work "on the basis of severe nearly uncontrollable hypertension associated with an atrial arrhythmia, atrial flutter." Dr. Irby also opined that Case was unable to work based on her constant symptoms associated, in part, with intermittent atrial fibrillation. Case argues that the Committee erred in refusing to adopt the opinions of Dr. Irby and Dr. Mulholland. With regard to Case's arrhythmia, PERS found the following:
Notwithstanding the letter of Dr. Mulholland, the Board finds little evidence that Ms. Case is disabled as a result of hypertension, or what appear to be rare and intermittent episodes of rapid heart rate. All records from Dr. Stone and Dr. Mulholland suggest that Ms. Case experienced rare episodes of this benign condition of rapid heart rate, and over a period of six years made minimal changes to her medical regimen, often reporting she was in "good control" of her cardiac symptoms.
¶ 28. Based on our review of the records, we find that PERS's decision that Case is not permanently disabled as a result of arrhythmia to be supported by substantial evidence. As the Committee stated, Dr. Mulholland noted repeatedly throughout his treatment of Case that her atrial fibrillation was under good control with the Tambocor. Moreover, based on its review, of Case's medical records, the Committee made specific and detailed factual findings regarding Case's medical history as it pertained to her arrhythmia and found that on numerous occasions Case's heart-related test results were normal. Based on these findings, the Committee concluded that there was a lack of evidence indicating that Case's "rare and intermittent episodes of rapid heart rate" were disabling. Thus, in declining to rely on Dr. Mulholland's and Dr. Irby's opinions, the Committee impliedly found that such opinions were not supported by the medical record evidence. "[T]he weight given to the statements of a personal physician is determined by PERS, and it is not for the courts to reweigh the facts." Pub. Employees' Ret. Sys. v. Stamps, 898 So.2d 664, 674(¶ 32) (Miss.2005) (citing Dishmon, 797 So.2d at 888). Moreover, this is not a case in which the Committee rejected the only evidence presented without presenting a contrary view of that evidence; rather, the Committee evaluated *314 Case's medical records and cited specific medical evidence from the record in support of its finding that Case's arrhythmia was not disabling. The Committee contradicted the opinions of Drs. Irby and Mulholland regarding Case's atrial fibrillation with medical reports from Dr. Mulholland indicating that such condition was controlled by medication. Accordingly, we find that the Committee's decision that Case was not disabled as a result of her arrhythmia to be supported by substantial evidence.
¶ 29. Case contends that the Committee was not permitted to reject the opinions of Drs. Irby and Mulholland without sending Case to be examined by a cardiologist who could contradict such opinions. Case argues that the physicians on the Committee did not have the authority to examine her medical records and determine on their own that the opinions were not credible because Case did not have the opportunity to cross-examine the Committee members. However, as was previously discussed, the physicians on the Committee are permitted to rely on their own expertise, and this Court may rely on such, so long as a thorough set of findings and conclusions explain the expertise they applied. Flowers, 952 So.2d at 980(¶ 26). In Flowers, the court noted that this was the benefit of having physicians on the Committee. Id. The Flowers court also noted, in response to the plaintiff's claim that PERS was required to send her to a physician for examination if they chose to reject her evidence, that PERS is not required to send an individual seeking disability benefits for an independent examination; rather, such decision is made discretionary by statute. Id. at 981(¶ 29) (citing Miss.Code Ann. § 25-11-113(1)(e) (1999)). The court stated:
Any agency's use of discretion is a matter subject to review for an abuse in its exercise. We do not interpret Howard to require a finding that there has been such abuse whenever another medical examination is not required by PERS. Here, the agency determined it had sufficient evidence to make its determination. Though we may have weighed the evidence differently, we defer to that decision-making unless there is insubstantial evidence to support it or arbitrariness in how the decision was reached.
Id. Thus, PERS was not required to send Case to a cardiologist in order to reject Drs. Irby's and Mulholland's opinions and, given that the Committee adequately explained its rejection of the opinions, we cannot say that it was an abuse of discretion for the Committee not to have had Case evaluated by a cardiologist. It should also be noted that, although PERS did conduct an independent medical examination of Case, the Committee did not appear to rely on the results of such examination in denying disability benefits based on Case's hypertension and atrial fibrillation.
¶ 30. Case also relies on Marquez for her argument that PERS's failed to contradict her evidence by noting Case's normal cardiac tests or normal blood pressure readings; however, Marquez is readily distinguishable from the case at bar. In Marquez, the court stated:
Marquez's situation is similar in that the PERS board of trustees acted, but we do not know what it was about the evidence that persuaded the board that Marquez was not disabled. PERS put forth no controverting evidence in the face of various medical diagnoses made by various credible doctors. . . . In support of its conclusion, PERS has stated only that Marquez lacks sufficient "objective" medical evidence. In light of the objective diagnoses made by Marquez's *315 treating physicians, PERS's conclusion is simply not substantiated by the record.
Marquez, 774 So.2d at 429(¶ 31). On the contrary, in this case, the Committee identified the evidence which persuaded it that Case was not disabled, and it identified the evidence which controverted Dr. Irby's and Dr. Mulholland's opinions. Therefore, Case's reliance on Marquez is misplaced.
C. Fibromyalgia
¶ 31. With regard to Case's claim of disability based on fibromyalgia, Case was originally treated by Dr. Hensarling, a rheumatologist, who diagnosed Case with fibromyalgia and prescribed non-narcotic pain relievers. Subsequently, Dr. Irby referred. Case to Dr. Rockhold, also a rheumatologist, who also found that Case suffered from fibromyalgia. Dr. Irby opined that Case was disabled, in part, as a result of her multiple symptoms from fibromyalgia. However, as the Committee noted, Dr. Rockhold stated on the "Form 7 Statement of Examining Physician" that Case had "no fibromyalgia related impairments"; Dr. Rockhold listed no restrictions on Case's activities or work. As the Committee has the sole responsibility of assessing the evaluations by medical personnel and determining which evaluations to rely upon, Johnston, 827 So.2d at 3(¶ 7) (citing Byrd, 774 So.2d at 438(¶ 15)), Dr. Rockhold's opinion alone is sufficient to constitute substantial evidence supporting the Committee's decision that Case was not disabled as a result of fibromyalgia.
¶ 32. Moreover, after reviewing Case's medical records, the Committee found that virtually all of Case's laboratory studies from Dr. Hensarling were normal or within acceptable limits. The Committee also noted that Dr. Hensarling did not provide a PERS "Form 7, Statement of Examining Physician" in support of any claimed impairment, limitation, or disability on behalf of Case; and Dr. Hensarling did not mention anything in Case's medical records that would suggest Case was disabled or had restrictions, limitations, or impairments resulting from fibromyalgia. Finally, the Committee noted Case's testimony that her primary problems were her blood pressure and heart problems, and the Committee found that the evidence indicated that most of Case's work days missed were attributed to her complaints she related to blood pressure or cardiac complaints. Based on these findings, we conclude that the Committee's decision that Case was not disabled as a result of her fibromyalgia is supported by substantial evidence.
D. Arthritis in Knees and Arms
¶ 33. Case testified at the hearing in this matter that she had arthritis in her knees and neck stiffness and pain that radiated into her shoulders. Case had a cervical fusion operation in March 1999, which she claimed caused her major nerve and muscle damage and a loss of sensation in three of her fingers. She stated that she lost all of the strength in her arm and, therefore, she found it difficult to lift or pull files. She also testified that she had pain down her arm and pain in her right hip that radiated down her leg. Dr. Irby stated on his "Form 7 Statement of Examining Physician" that Case suffered from osteoarthritis, and he listed osteoarthritis as one of the impairments that contributed to his finding Case disabled.
¶ 34. However, in finding that Case was not disabled as a result of these ailments, the Committee noted that Case's rheumatologist, Dr. Rockhold, did not indicate any impairment resulting from arthritis. The Committee also found that the physician who performed Case's cervical fusion, Dr. Capel, noted on Case's final office note that Case was three months post-operation *316 and reported no significant arm pain, and that he cleared Case to return to work. Thus, the Committee found, "it would therefore be concluded that Ms. Case's surgical intervention was considered successful, as Dr. Capel's notes indicate a normal post-operative course without apparent complications, and she was cleared to return to work without restrictions." Finally, the Committee noted that the independent medical examination conducted by Dr. Polk revealed that Case had grossly normal sensation in her upper extremities, normal muscle tone, and normal hand coordination. Dr. Polk recommended that Case limit overhead work activities due to restrictions in the range of motion in her shoulders, but she found that Case was physically capable of performing the job of a secretary. We conclude that the Committee's finding that Case was not disabled as a result of arthritis or neck and arm pain is supported by substantial evidence in the record.
E. Depression and Anxiety
¶ 35. Case's primary physician, Dr. Irby, submitted a letter to PERS stating that Case is both physically and mentally unable to perform her duties as a secretary due to depressive neurosis and stress reaction.[12] He also stated that the stress of Case's work aggravated her depression. The Committee, however, found that there was insufficient evidence to support Case's claim of disability on the basis of anxiety or neurosis. As support for this decision, the Committee stated that Dr. Polk did not find Case to have a disabling mental condition or disorder, and that no records indicated Case to have been evaluated by a psychiatrist or psychologist for her mental condition or documented her degree of mental/psychiatric functioning with an objective and reproducible method. The Committee also stated that, at least initially, Case's depression was a secondary diagnosis and not the primary reason for her to seek disability. Further, while Dr. Irby had recommended that Case see a psychiatrist or clinical psychologist, Case was unable to do so for financial reasons. Thus, the Committee found the following:
The sum of evidence for claimant's diagnosis of disabling anxiety or' neurosis consists of Dr. Polk's observation of her "flat affect" during the evaluation, her documented use of commonly prescribed anti-depressant medications, and her treatment for this condition by Dr. Irby, a Nephrologist, albeit her primary physician. The PERS Disability Appeals Committee is sympathetic to the claimant's financial concerns, but does not feel that an award of disability benefits based on work-related stress and anxiety is appropriate where a claimant has never been evaluated or treated by a licensed Psychiatrist or Clinic Psychologist, even if the claimant asserts financial inability to seek care from these specialists.
¶ 36. We find PERS's decision with regard to Case's anxiety and depression not to be supported by substantial evidence in the record. In finding that Case was not disabled as a result of depression; the Committee relied on the fact that she had not been evaluated or treated by a psychiatrist or psychologist. Thus, Dr. Irby's treatment of Case for depression and anxiety was apparently insufficient for the Committee. However, the Mississippi Supreme Court has indicated that the fact that an individual has not been evaluated or treated by a specialist does not constitute substantial evidence in support of a finding that an individual is not disabled as a result of anxiety or depression. In Pub. *317 Employees' Ret. Sys. v. Ross, 829 So.2d 1238, 1243 (¶ 23-24) (Miss.2002), the court found that PERS's use of the fact that the claimant, who had been diagnosed and treated by two physicians for depression, had not been seen by a specialist for his depression as one basis for denying disability benefits was arbitrary and capricious as it was "based only on doubt." The court further found that "doubt does not constitute a finding." Id. at (1124). Therefore, we find that the fact that Case has not been treated by a psychologist or psychiatrist for her depression and anxiety is not substantial evidence supporting her denial of benefits.
¶ 37. The Committee also relied on the fact that Case's depression was, at least initially, a secondary diagnosis rather than the primary reason she was seeking disability. Regardless of whether the diagnosis was secondary, the fact remains that Case's primary physician, Dr. Irby, stated that she was disabled as a result of depression and anxiety, and medical diagnoses by licensed physicians constitute objective evidence of disability. See Marquez, 774 So.2d at 427 (¶ 21-22). "While it is true that PERS is not required to put forth contradictory evidence, it is required to make a nonarbitrary decision as to disability that comports with the statutory definition thereof." Ross, 829 So.2d at 1241(¶ 17). In this case, the Committee cited to nothing in the record indicating that Case's depression and anxiety are not. disabling. The Committee noted the fact that Dr. Polk, the physiatrist who performed the independent medical evaluation of Case, did not find that Case was disabled as a result of depression and anxiety. However, we think it necessary to read Dr. Polk's finding in this regard in the context of her entire conclusion. After noting in the "Impression" section of her findings that Case suffers from depression with anxiety, Dr. Polk stated as follows in pertinent part: "She has not had formal psychotherapy to address her depression and anxiety. Therefore, there is not enough medical evidence to support a disability based on her mental condition." Thus, Dr. Polk's opinion that Case was not disabled as a result of depression was not based on a `finding that Case did not suffer from depression and anxiety or that, even if she did suffer from such, ailments, they were not disabling; rather, her decision was based on the fact that Case had not sought formal psychotherapy treatment. Again, this does not constitute substantial evidence justifying a denial of benefits.
¶ 38. At oral argument, counsel for PERS contended that, while Case testified at the hearing before the Committee that she had a problem with depression, it was not her major problem, and that her heart problems and hypertension were the main reasons she cannot work. Therefore, according to PERS, Case did not claim that her depression and anxiety were disabling. We acknowledge that the Mississippi Supreme Court has indicated that it is reasonable to disregard a physician's opinion that a claimant is disabled when the claim ant de-emphasizes the seriousness of her condition at the hearing. See Dishmon, 797 So.2d at 894(¶ 22). However, while we might find Case's testimony in this regard de-emphasized her depression and anxiety to some extent, the Committee did not rely on such testimony in denying Case's claim for benefits. Rather, as noted above, the Committee relied on the fact that Case had not been treated by a psychiatrist or psychologist. The Mississippi Supreme Court has held that an appellate court may "affirm where an agency or lower court reaches the right result for the wrong reason." Falco Lime v. Mayor & Aldermen of Vicksburg, 836 So.2d 711, 725(¶ 62) (Miss.2002) (citing Jackson v. Fly, 215 Miss. 303, 311, 63 So.2d 536, 537 (1953)). *318 However, in the PERS context, it is well settled that PERS is the sole fact-finding body when it comes to award of disability benefits and that this Court, in reviewing PERS's decision, is not permitted to reweigh the evidence or substitute its judgment for that of PERS. Cobb, 839 So.2d at 609(¶ 12); Howard, 905 So.2d at 1284(¶ 15). In addition, courts have "`emphasized the need for understanding why an agency rules in a certain way in order to determine whether the Board acted arbitrarily and capriciously and whether substantial evidence undergirds its actions.'" Public Employees' Ret. Sys. v. Bishop, 942 So.2d 259, 265(¶ 26) (Miss.Ct.App.2006) (quoting Marquez, 774 So.2d at 429(¶ 30)). If we were to uphold PERS's decision that Case is not disabled as a result of depression based on an interpretation of evidence not relied on by PERS, we would be acting de novo; this is not our role on review.[13] Accordingly, we find that PERS's finding that Case is not disabled as a result of depression and anxiety is not supported by substantial evidence, and thereby reverse and remand with instructions to award appropriate disability benefits to Case consistent with applicable law.
¶ 39. Case's second contention is that, if this Court does not reverse and remand this case with instructions for PERS to award Case disability benefits, then we should find that PERS's failure: (1) to order an independent psychiatric evaluation; (2) to obtain Case's Social Security Administration disability decision and review the psychological report obtained in that case a week prior to the hearing in this matter; and (3) to obtain the medical records regarding her cervical fusion operation denied her due process. However, we have already reversed the *319 Committee's decision that Case was not permanently disabled as a result of anxiety or depression, finding that the decision was not supported by substantial evidence. Therefore, we remand this case for an award of benefits to Case. Accordingly, Case's alternative argument is moot.
¶ 40. THE JUDGMENT OF THE CIRCUIT COURT OF HINDS COUNTY, FIRST JUDICIAL DISTRICT, IS REVERSED, AND THIS CAUSE IS REMANDED TO THE MISSISSIPPI PUBLIC EMPLOYEES' RETIREMENT SYSTEM WITH INSTRUCTIONS THAT THE APPELLANT, CHERRI CASE, BE AWARDED DISABILITY BENEFITS AS ALLOWED UNDER APPLICABLE LAW. ALL COSTS OF THIS APPEAL ARE ASSESSED TO THE APPELLEE.
KING, C.J., LEE AND MYERS, P.JJ., IRVING, CHANDLER, ISHEE, ROBERTS AND CARLTON, JJ., CONCUR. GRIFFIS, J., DISSENTS WITHOUT SEPARATE WRITTEN OPINION.
NOTES
[1] A physiatrist is a physician who specializes in physical medicine and rehabilitation. Ida G. Cox et al., Attorney's Illustrated Medical Dictionary P36 (West Publishing Company 1997).
[2] Dr. Irby noted that, earlier that month, Case had visited the emergency room complaining of nonspecific weakness, at which time she was having heart palpitations. She was put on. Calan SR 240 for the palpitations and Serzone for depression.
[3] On September 20, 1995, Dr. Irby instructed Case to come to his office weekly for blood pressure readings.
[4] Case complained of worsening palpitations and atrial fibrillation. Dr. Irby noted at the visit that her heart had a regular rate and rhythm with maybe a slight tachycardia.
[5] The test also revealed ST depression and unifocal PVCs, but no significant conduction abnormalities.
[6] Dr. Mulholland also noted probable diagnoses of fibromyalgia by history and anxiety neurosis.
[7] As PERS noted, Dr. Mulholland stated that Case was returning for a follow-up of "atrial flutter," though this appears to be the first use of this terminology in Case's medical records.
[8] He noted that she had no new symptoms other than that her job was stressful and she felt like her heart beat fast quite a bit, and that that day was one such day. The EKG he performed showed a sinus rhythm at a rate of ¶ 2.
[9] He also noted that Case continued to have trouble with her other medical problems including fibromyalgia.
[10] The Committee mistakenly referred to Dr. Philip Hensarling. All medical records, however, reflect treatment by Dr. Ken Hensarling.
[11] Case also testified that her physicians told her that because of her uncontrollable hypertension, she would die if she kept working.
[12] He further listed Case's fibromyalgia syndrome as disabling.
[13] Moreover, a review of Case's testimony in its entirety reveals that the issue of whether Case deemphasized her depression is not as clear cut as counsel for PERS contends. The following are excerpts of Case's testimony regarding her depression:

Q: And there has been some mention in the records about depression or anxiety? A: Yes sir.
Q: Is that a big issue for you?
A. Yes, sir, it is. I would like to be working and I can't. It is depressing.
Q: You feel that's more a result of not working than a cause of some of your problems?
A: I think a lot of the medicines that I takeI take 17 difference kinds of medicines. That may contribute to it. I don't know. I do have a problem with that, but it's not my major problem.
Q:When did you begin taking any antidepressants. Zoloft, or any antidepressants? A: I've been on a lot of difference medicines, and I would say probably at least five years, if not more than that.
Q: What were you first put on for that sort of thing and who prescribed it?
A: Dr. Irby.
Q: And what did he put you on?
A: He put me on Serzone, and from there he went to the others. I've tried Paxil. He had put me on Paxil. He's put me on Zoloft. And he's put me on Prozac, and he has put me on Effexor now.
. . .
Q: Has Dr. Irby ever sent you to one [a psychologist], or have you ever discussed A: He had discussed it with me. He felt I needed to go, but. I have so manyI did not feel like I could afford to go at the time. And that's why I guess he just continued to try different medications to see, you know, what would help me, and nothing seemed to help.
Q: With regard to your anxiety and depression, would you describe that as getting better or worse or the same?
A: It seems to be getting worse.
Q: How does that interfere with your ability to work, say when you are working?
A: I do this a lot. I cry a lot. And I'm very nervous, just very shaky and nervous. And the depression, I stay depressed most of the time. My family is very, very comforting. They help me, but I can'tlike I said before, I don't really have a social life. I don't go out very much, and my husband ishe's really taken on a lot of responsibilities that I should be doing.